**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

MI-BOX NEW ENGLAND, LLC, and
MI-BOX FLORIDA, LLC,

        Plaintiffs,           )
                              )
        v.                  )  No. 21 C 5809
                              )   consolidated with
MI-BOX HOLDING COMPANY,      )  No. 22 C 4513
        Defendant.          )
                              )
_____)
                              )  Magistrate Judge M. David Weisman
MI-BOX HOLDING COMPANY,      )
        Counter-Plaintiff,     )
                              )
        v.                  )
                              )
MI-BOX NEW ENGLAND, LLC, and  )
MI-BOX FLORIDA, LLC,         )
        Counter-Defendants.    )

**REPORT AND RECOMMENDATION**

For the reasons set forth in this report and recommendation, the Court recommends to the district court that Counter-Plaintiff MI-BOX Holding Company's ("MHC") motion for a preliminary injunction [217] be granted, as set forth herein.[1]

**I.      Background**

This case, and the business relationship between the parties, has a long and tortured history, and the Court will not detail it in full. Briefly, Defendant MI-BOX Holding Company ("MHC") is a mobile storage company that provides storage and moving solutions for both home and business using its patented container transport system, the MI-BOX Level Lift System, and storage containers.[2] Between 2010 and 2014, MHC sold exclusive territories in North America and

_____

[1] MHC's motion to strike certain paragraphs of the declaration of Edward Smith [246] is denied. The Court has significant leeway in determining what evidence to rely on in addressing the parties' arguments on a preliminary injunction motion. *BrightStar Franchising, LLC v. Foreside Mgmt. Co.*, No. 25 C 8741, 2025 WL 3022590, at *1 n.1 (N.D. Ill. Oct. 29, 2025) ("[C]ourts rely on relaxed evidentiary standards during preliminary injunction proceedings."). The Court's consideration of the evidence was appropriate in this case as summarized in this report and recommendation.

[2] The relevant background facts are taken from the declaration of Michael Born, co-founder, shareholder, and vice-president of MHC (Dkt. # 218-1), the background facts as set forth in MHC's

Canada to Master Dealers to operate a MI-BOX dealership in accordance with its Master Dealer Agreement ("MDA"). The MDA requires that the Master Dealer pay MI-BOX a territory fee in exchange for the right to operate a MI-BOX dealership within that territory and use the MI-BOX trademark. The MDA further granted the Master Dealer the right to purchase MHC's patented lift system, purchase MI-BOX branded products and services, and be included on the MI-BOX national website that directs customers to Master Dealers based on zip code. As is relevant here, on or about June 1, 2012, MHC entered an MDA with MI-BOX New England, LLC ("MI-BOX NE" or "NE"), which purchased a Master Dealership for the states of Maine, New Hampshire, Vermont, Rhode Island and Massachusetts for $150,000.00. (Born Decl., Dkt. # 218-1, ¶ 19).

The MDA allows Master Dealers to sell portions of its territory to a Subdealer, which will operate a MI-BOX dealership within that territory in accordance with two agreements: a Dealership Agreement signed between the Subdealer and the Master Dealer, and a MI-BOX Equipment Purchase and License Agreement ("ELA"), which is signed between the Subdealer and MHC. (*Id.* ¶ 11.) From 2019 to September 2019, MI-BOX NE entered into separate Dealership Agreements with 11 Subdealers in MI-BOX NE's territory, with NE receiving more than $1.5 million in territory fees from the Subdealers. (*Id.* ¶¶ 21-32.) At some point, NE gave MI-BOX Southern New Hampshire (hereinafter "MI-BOX SNH" or "SNH") (both of which are owned and operated by Edward Smith) territory rights in the state of New Hampshire, and SNH operated from 2013 to May 5, 2016. According to MHC, NE did this without requiring execution of a Dealership Agreement and without requiring payment of a territory fee. In other words, NE gave territory rights to MI-BOX SNH for no compensation. (*Id.* ¶ 33.) On May 5, 2016, NE's Chief Financial Officer, Scott Kelly, asked MHC to enter an ELA with SNH, and MHC executed an ELA with SNH. (*Id.* ¶ 35.)

The relationship between MHC and NE deteriorated, and when the MDA came up for renewal in January 2022, MHC sent NE a notice of non-renewal based on various purported breaches of the MDA by NE.[3] The parties subsequently engaged in settlement negotiations, which included the execution of an asset purchase agreement ("APA") pursuant to which Smith would take over MI-BOX. The parties also entered into a Tolling Agreements while they attempted to resolve their differences, as explained later in this order. After several years of attempts at resolution were unsuccessful, on April 1, 2025, MHC sent a cease-and-desist letter to Plaintiffs'

---

motion for a preliminary injunction, and the facts set forth in MI-BOX NE's response brief. The general background facts that set the stage for the current motion are not in dispute. Disagreements about facts will be noted when appropriate.

[3] NE then filed the instant lawsuit. The current amended complaint alleges: breach of contract, breach of the implied covenant of good faith and fair dealing, tortious interference with contract and prospective economic advantage, and commercial disparagement. NE filed a motion for temporary restraining order ("TRO") and preliminary injunction ("PI"), which was put on hold while the parties attempted to amicably resolve the dissolution of their relationship through an asset purchase agreement and then a de-coupling agreement. These attempts failed and NE renewed its motion for a TRO and a PI, and on April 18, 2025, the district court denied NE's motion, finding MHC's contention of imminent irreparable harm to be too speculative for the imposition of a temporary restraining order. The district court's TRO order is discussed later in this order.

counsel and copied all sub-dealers in Plaintiffs' networks. (Smith Decl., Dkt. # 240-1, ¶ 36.) The letter asserted that NE's MDAs had expired or were terminated and demanded that NE immediately cease using the MI-BOX name, selling MI-BOX dealerships, or otherwise holding themselves out as MI-BOX dealers. (*Id*. ¶ 37.) Based on the nonrenewal of the MDA and other alleged breaches of the MDA and ELA, discussed in further detail below, MHC contends that NE and SNH no longer possess rights to use the MI-BOX trademark.

On September 8, 2025, MHC filed a motion for TRO and PI alleging trademark infringement under the Lanham Act [217]. The district court denied the TRO [221] and referred the PI to this Court for a report and recommendation. The parties filed briefs, the Court held a hearing on November 18, 2025, and the Court now issues its report and recommendation.

## II.     Analysis

### A.  Preliminary Injunction

MHC seeks the instant preliminary injunction under the Lanham Act, which "established a federal right of action for trademark infringement to protect both consumer confidence in the quality and source of goods and businesses' goodwill in their products." *Chen v. Does 1-10*, No. 25 CV 6611, 2025 WL 3022526, at *1 (N.D. Ill. Oct. 29, 2025) (citation and internal quotation marks omitted). A "preliminary injunction is 'an extraordinary remedy' that is 'never awarded as of right.'" *Id*. at *2 (citations omitted). To obtain a preliminary injunction, a plaintiff must show that (1) he has some likelihood of success on the merits of his claim; (2) traditional legal remedies are inadequate; and (3) he would suffer irreparable harm without preliminary injunctive relief. *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020). "The two most important factors are likelihood of success on the merits and irreparable harm." *K.C. v. Individual Members of Med. Licensing Bd. of Ind.*, 121 F.4th 604, 646 (7th Cir. 2024) (Jackson-Akiwumi, J., dissenting) (citing *Bevis v. City of Naperville, Ill.*, 85 F.4th 1175, 1188 (7th Cir. 2023)). If the movant makes this required threshold showing, "the court must then balance the harm the moving parties would suffer without an injunction against the harm the opposing parties would suffer if one is granted, and the court must consider the public interest, which takes into account the effects of a decision on non-parties." *Camelot Banquet Rooms, Inc.*, 14 F.4th 624, 628 (7th Cir. 2021). "This balancing test is done on a sliding scale: 'If the [movant] is likely to win on the merits, the balance of harms need not weigh as heavily in his favor.'" *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021) (quoting *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020). "The party seeking a preliminary injunction bears the burden of showing that it is warranted." *Finch v. Treto*, 82 F.4th 572, 578 (7th Cir. 2023) (quoting *Speech First, Inc.,* 968 F.3d at 637).

#### 1.  Likelihood of Success on the Merits

To prevail on a trademark infringement claim, "the plaintiff must establish 'that (1) [its] mark is protectable and (2) the defendant's use of the mark is likely to cause confusion among consumers.'" *Slep-Tone Entm't Corp. v. Coyne*, 141 F. Supp. 3d 813, 826 (N.D. Ill. 2015) (citation omitted). MHC owns its federally registered MI-BOX trademark. (Am. Counterclaim, Dkt. # 212, ¶¶ 219-22); MHC Ex. A-2, Dkt. # 218-3, U.S. Trademark Registration No. 3703509.) It is uncontested that MHC has continuously and pervasively used the MI-BOX mark since 2005 in

connection with its mobile storage services business and dealership program. (Born Decl., Dkt. # 218-1, ¶ 6.) Thus, MHC has established the first element.

Before proceeding to the likely-to-cause-confusion element of the trademark infringement claim, NE and SNH contend that the Court must first address NE and SNH's affirmative defenses: (a) that NE and SNH were not in breach of the MDA and ELA, respectively, and thus had a contractual right to use the MI-BOX trademark; (b) that MHC waived its rights under the applicable agreements; and (c) that MHC acquiesced to NE and SNH's continued use and operation of their respective businesses under the Marks. The Court addresses each of these arguments in turn.

NE's breach of the MDA. Regarding NE's argument that it was not in breach of the MDA and properly exercised its right to renew the MDA, thus establishing its ongoing right to use MI-BOX mark, the Court finds Judge Valderrama's April 18, 2025 ruling on NE and SNH's motion for preliminary injunction to be instructive. In considering the motion, Judge Valderrama noted that "whether MI-BOX NE's ability to demonstrate a likelihood of success on this element turns on whether MI-BOX NE can demonstrate a likelihood *that it did not breach the MDA* in the ways that MHC alleges." (4/18/25 Order, Dkt. # 192, at 12) (emphasis added, in part). After analyzing the relevant issue, Judge Valderrama concluded:

> The record before the Court demonstrates that in 2012, MI-BOX NE purchased a Lift System named "Hercules." R. 114-6, Kelly Dep., 30:19–22, 33:22–34:18; see also R. 119-7, Smith Dep., 14:1–3. In 2017, MI-BOX NE then transferred Hercules to Coastal MI-BOX, one of its sub-dealers. Kelly Dep., 35:18–22, 90:20–91:5; Smith Dep., 14:4–12. Accordingly, to comply with the MDA, MI-BOX NE had to provide written notice and right of first refusal to MHC prior to this transfer of Hercules. However, the record does not indicate that MI-BOX NE did so.
>
> . . . . [T]he record before the Court, albeit somewhat scant on this issue, raises serious doubts as to MI-BOX NE's assertion that it did not breach the MDA—the evidence (or lack thereof) seriously calls into question whether MI-BOX NE provided the requisite written notice and right of first refusal to MHC regarding the transfer of Hercules. The only evidence of MI-BOX NE's written notice is an email that fails to include the "address of the proposed transferee" and the "terms upon which payment for the Lift System(s) is supposed to be made," in violation of § 1.19 of the MDA. See MDA at 5. And there is no evidence that MI-BOX NE provided MHC with right of first refusal, as Kelly flatly admitted that he did not know whether MI-BOX NE contacted MHC to provide such a right. MI-BOX NE has not demonstrated that it is likely to prove the third element of its breach of contract claim—that is, whether MHC breached the MDA by falsely asserting that MI-BOX NE breached the MDA. As such, the Court finds that MI-BOX NE has not

4

demonstrated it is likely to succeed on the merits of its breach of contract claim against MHC.

(4/18/25 Order, Dkt. # 192, at 14-16.)   The Court sees no basis on which to revisit Judge Valderrama's reasoned analysis and finds this weighs in favor of finding that MHC has a likelihood of success that it can show that NE breached the MDA, thus permitting MHC not to renew the MDA and, in turn, causing NE to lose its right to use the MI-BOX mark.

SNH's breach of the ELA.  MHC contends that SNH breached the ELA when it purchased in 2018 the MI-BOX Lift System known as "Titan" from New England Truck Solutions, and not MHC, as the ELA required.  As a result, MHC argues, SNH lost its right to use the MI-BOX trademarks.  SNH admits that it purchased a Lift System but does not respond to MHC's contention that SNH breached the ELA by not purchasing the Lift System from MHC.  (Counter-Defs.' Resp, Dkt. # 240, at 8) ("In December 2018 MI-BOX SNH purchased a Lift System referred to as Titan to transfer to a new subdealer within MI-BOX NE's territory, Greater Billerica and Burlington, LLC ["MI-BOX GBB"]).  Accordingly, SNH waived any right to challenge MHC's contention in this regard.

The same result follows, MHC asserts, when, in January 2019, SNH transferred the Titan Lift System to MI-BOX GBB[4] without notice to MHC, thus providing MHC the accompanying right of first refusal.[5]  SNH states that MHC was "well aware" of the transfer "as [GBB] did not directly purchase a Lift System directly from MHC," (Counter-Defs.' Resp., Dkt. # 240, at 8.)  Notably, however, SNH does not contend that it provided the notice required by the ELA.  Then, in spring 2021, MHC points out that SNH breached the ELA when it subsequently purchased back the Titan Lift System from MI-BOX GBB, again without notice and the right of first refusal to MHC. SNH essentially concedes that notice was not provided but asserts that MHC acquiesced to the transfer through its course of conduct, by subsequently selling "hundreds of storage containers to [GBB], reaping the benefit of those sales."  (*Id.*)  The Court rejects this premise for the reasons explained in the next section.  The Court finds that because SNH did not provide the requisite notice and right of first refusal for either the 2019 or the 2021 transfers of the Titan Lift System, SNH was in breach of the ELA and lost its right to use the MI-BOX trademark.

Waiver.  NE and SNH argue that MHC waived its right to challenge the transfers under the MDA and ELA.  Specifically, they assert that "MHC's acceptance of Counter-Defendants' ongoing

---

[4]   MI-BOX GBB is owned by MI-BOX SNH. (Counter-Defs.' Resp, Dkt. # 240, at 8) ("[I]n or about May 2012, MI-BOX SNH acquired the entire dealership assets of MI-BOX [GBB] (which included the Titan Lift System.)").

[5]  Section 1.19 of the ELA states that SNH shall not sell or transfer the Lift System or any part thereof and may do so only in accordance with §§ 1.20 and 1.21 of the ELA.  Section 1.20 requires written notice to MHC of the proposed transaction with relevant information regarding the transfer, including the name and address of the proposed transferee, and the date and terms of the proposed transaction.  Section 1.20 also provides MHC with a right of first refusal.  Section 1.21 provides that SNH may only transfer possession of the Lift System to a third party if the Buyer has complied with § 1.20 and pays MHC any current use and licensing fees.

performance[6] and dealer fees while simultaneously claiming the agreements were terminated or expired constitutes a clear waiver of any claimed breach or termination rights." (*Id*. at 22.) MHC contends that no waiver occurred, pointing to the non-waiver provisions in both the MDA (§ 4.6) and the ELA (§ 4.5), which state that "[n]o waiver of any term, covenant or condition to this Agreement shall be valid unless in writing and signed by the party or persons to be charged." "A non-waiver provision is enforceable under Illinois law[] but can itself be waived." *Tas Distrib. Co., Inc. v. Cummins, Inc.*, No. 07-CV-1141, 2013 WL 12296625, at *2 (C.D. Ill. May 16, 2013) (citing *Roboserve, Inc. v. Kato Kagaku Co.*, 78 F.3d 266, 277 (7th Cir. 1996)). "As a result, a waiver affirmative defense must be shown by clear and convincing evidence when a non-waiver provision is part of the contract." *Id.* Here, NE and SNH do not point to any record evidence of a written signed waiver by MHC. In fact, with respect to the ELA, as MHC's counsel addressed at the November 18, 2025 oral argument, the evidence shows that MHC expressly stated its position that the 2021 transfer of the Lift System required notice under the ELA, which was not provided. (Timeline, Ex. 3, 6/28/21 Letter from C. Hesse to M. Delaney) ("[GBB/NE] failed to give notice of the transfer of its Lift System under 1.23 of its [ELA], did not provide [MHC] with a right of first refusal under 1.24 of the Agreement, and did not provide the transfer details as required under section 1.25(a)-(e)."); (*Id*., Ex. 5, 7/1/21 Letter from C. Hesse to M. Delaney.). The same is true regarding the MDA. While the Court acknowledges NE and SNH's position on this issue, it notes that they did not respond to the effect of the non-waiver clauses in the agreements, which absent any evidence to the contrary, the Court finds are controlling here. For these reasons, the Court finds SNH and NE's contention that MHC waived its right to challenge the transfers at issue has not been established by clear and convincing evidence and is therefore unavailing.

Acquiescence. In a related argument and for the same reasons, NE and SNH assert that "through years of consistent conduct of the parties continuing in the ordinary course of business operations, and MHC's profiting from relationships dependent on Counter-Defendants' use of the MI-BOX marks—MHC has acquiesced to Counter-Defendants' trademark usage." (Counter-Defs.' Resp., Dkt. # 240, at 23.) In support, NE and SNH point to a three-element test for acquiescence in trademark usage as stated in *Jim Mullen Charitable Found. v. World Ability Federation, NFP*, 917 N.E.2d 1098, 1110 (Ill. App. Ct. 2009) ("'(1) the senior user actively represented that it would not assert a right or a claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice.'"). Assuming for purposes of this motion that this test is applicable to the instant case, NE and SNH's acquiescence argument fails. "A plaintiff communicates active consent through conduct amounting to 'an explicit or implicit assurance that plaintiff, with knowledge of defendant's conduct, will not assert its trademark rights.'" *Id.* NE and SNH do not point to any evidence that MHC explicitly or implicitly assured NE and SNH that it would not assert its trademark rights. NE and SNH's payment of bills or fees and MHC's issuance of invoices are not, as a matter of law, evidence of acquiescence. *Id*. at 1110. ("After reviewing the record,

---

[6] NE and SNH assert that "[d]espite MHC's lengthy knowledge of each transfer [of the Lift Systems] . . . , MHC continued business in the normal course through March 31, 2025 with [NE and SNH]." (Counter-Defs.' Resp., Dkt. # 240, at 22.) NE and SNH further state that "MHC was well aware MI-BOX NE and MI_BOX SNH facilitated Lift System acquisitions for new dealers and did not object to the practice until Edward M.P. Smith expressed dissatisfaction with the MHC system." (*Id.*)

we cannot say JMFs' conduct in allowing defendant to pay the $28,000 in unpaid bills indicated as a matter of law that JMF actively consented to defendant's use of the mark."). Because NE and SNH have not established the elements of the acquiescence test they cite, the Court finds this defense fails.

Having resolved NE and SNH's defenses in MHC's favor, the Court now moves to analyze whether MHC has demonstrated a likelihood of confusion. "Seven factors are generally considered in assessing the likelihood of confusion: '(1) the similarity between the marks in appearance and suggestion, (2) the similarity of the products, (3) the area and manner of concurrent use of the products, (4) the degree of care likely to be exercised by consumers, (5) the strength of the plaintiff's marks, (6) any evidence of actual confusion, and (7) the defendant's intent to palm off its goods as those of the plaintiff's.'" *Keeper Security, Inc. v. Keeper Tax Inc.,* No. 23 C 1043, 2025 WL 3268304, at *3 (N.D. Ill. Nov. 24, 2025) (citations omitted). While NE and SNH mention the seven factors, they fail to address their applicability here, thus waiving any argument that MHC has not established these factors. NE and SNH's sole reliance on their affirmative defenses is unavailing, for reasons already stated. The Court notes at the outset that given this case involves licensing of the exact same mark, not a purportedly similar one, satisfaction of the various factors is presumed. *Nat'l Truck Prot. Co., Inc. v. Crown Point Truck & Trailer Repair Ctr., Inc.*, No. 23 CV 16880, 2025 WL 1348564, at *4 (N.D. Ill. May 8, 2025) ("[T]he seven factors are irrelevant for infringement involving a licensor and ex-licensee. Rather, it is well-established that 'the use of a trademark after a license agreement's termination *by itself* establishes a likelihood of confusion.'") (quoting *Chicago Mercantile Exch. Inc. v. ICE Clear US, Inc.*, No. 18 C 1376, 2020 WL 1905760, at *18 (N.D. Ill. Apr. 17, 2020) (emphasis added in *Nat'l Truck*). In the interests of completeness, the Court discusses the seven factors briefly.

The similarity between the marks is easily satisfied as they are the exact same mark, the MI-BOX mark; NE and SNH are using the MI-BOX mark to promote their mobile storage and moving businesses, (Born Decl., Dkt. # ¶¶ 6, 74, 75), the same businesses in which MHC operates; regarding the area and manner of use, through NE and SNH, MHC has operated (and presumably will continue to operate in the relevant New England area; again, given the presence of the MI-BOX mark in the relevant area through MHC's agreements with NE and SNH, the degree of care likely to be exercised by consumers is minimal and weighs in favor of MHC; as previously noted, the MI-BOX mark has been continuously used since 2005 in connection with MHC's business (Born Decl., Dkt. # 218-1, ¶ 6), so the strength of the mark weighs in favor of MHC and protecting the mark; though failing to point to any evidence of actual confusion, MHC contends that NE and SNH's continued use of the MI-BOX mark as former licensees has created actual confusion because of the association customers make with the MI-BOX mark, *see Burger King Corp. v. Agad*, 911 F. Supp. 1499, 1504 n. 4 (S.D. Fla. 1995) ("'A licensee who once had authorization becomes associated in the public mind with the licensor or franchisor.'") (citation omitted), and the Court agrees, so this factor weighs in MHC's favor; NE and SNH's continued use of the MI-BOX mark as representing their non-licensed products and services weighs in favor of MHC. (Born Decl., Dkt. # 218-1, ¶¶ 74-75) (NE and SNH continue to use the MI-BOX mark). Based on the presumption of the likelihood of confusion because each of the factors weigh somewhat-to-strongly in MHC's favor, the Court finds a likelihood of confusion exists.

7

2. *Irreparable Harm and No Adequate Remedy at Law*[7]

MHC asserts it will suffer irreparable harm and has no adequate remedy at law, which are presumed here. *Rosati v. Rosati*, No. 20 C 7762, 2021 WL 3666432, at *11 (N.D. Ill. Aug. 18, 2021) ("It has . . . long been the law in the Seventh Circuit that the lack of an adequate remedy at law and irreparable harm are generally presumed in trademark infringement actions.") Indeed, "irreparable harm is especially likely in a trademark case." *Kraft Foods Group Brand LLC v. Cracker Barrel Old County Store, Inc.*, 735 F.3d 735, 741 (7th Cir. 2013).

NE and SNH contend that MHC's delay in seeking relief rebuts the presumption of irreparable harm, noting that "[a] lengthy, unexplained delay in seeking relief calls into question 'how urgent the need for [preliminary] equitable relief really is.'" (Counter-Defs.' Resp., Dkt. # 240, at 13) (quoting *Redbox Automated Retail, LLC v. Xpress Retail LLC*, 310 F. Supp. 3d 949, 952 (N.D. Ill. 2018). According to NE and SNH, MHC was aware of the unauthorized transfer of the MI-BOX Lift Systems in 2019, (MHC's Mem. Supp. Mot. TRO and Prelim. Inj., Dkt. # 218, at 8), and sent the letter of non-renewal of the MDA in January 2022, but did not file the motion for TRO and PI until September 8, 2025, over three-and-a-half years later. This contention, however, is belied by the Tolling Agreement between the parties to preserve the status quo while they attempted to resolve their differences via the APA and de-coupling agreements. The Tolling Agreement, dated May 5, 2023, generally indicated that while the parties were discussing the possibility of Edward Smith or an affiliated entity acquiring the assets of MHC, any period of limitation, period of repose, or any other rule, including a defense of failure to timely file suit, would be tolled from January 1, 2023 to the latest of the date of completion of the transaction; an indication that negotiations had ceased; or December 31, 2023. (MHC's Reply, Tolling Agreement, Exh. M, Dkt. # 245-7.) The APA was signed on February 9, 2024 and the parties continued due diligence and negotiation on the transaction through March 2025. **(**Timeline, Dkt. # 260.)

NE and SNH acknowledge the Tolling Agreement, but respond that "[e]ven examining the absolute latest date MHC alleges the MDA termination was tolled to—January 10, 2025—MHC waited until September 8, 2025, two days shy of ten months, to finally assert it will suffer irreparable harm absent injunctive relief," which was too late, according to NE and SNH. (Counter-Defs.' Resp., Dkt. # 240, at 13.) But, as MHC notes, on March 28, 2025, the parties reported to Judge Valderrama in related case number 22 C 4513 that the APA had expired and an extension would not be signed, but the parties were still discussing ways to "de-couple" their business relationship. (No. 22 C 4513, Dkt. # 27.) According to MHC, these discussions continued through April 2025. (MHC's Reply, Dkt. # 245, at 10.) In June, MHC invoked its option to terminate the ELA based on breach, MI-BOX SNH then asserted it would not cease and desist using the MI-BOX mark, and MHC filed its motion for TRO and PI on September 8, 2025. (Timeline, Dkt. # 260. To the extent NE and SNH assert that the ELA was not subject to a tolling agreement, the Court does not read the Tolling Agreement or the subsequent efforts by the parties

---

[7] Because irreparable harm and no adequate remedy at law "tend to merge," *Mechling v. Operator of Website Muaythaifactory.com*, No. 21 C 1538, 2021 WL 3910752, at *7 (N.D. Ill. Sept. 1, 2021), the Court addresses these two elements together.

to "de-couple" to be related solely to the MDA; efforts at resolution appear to have encompassed the parties' entire relationship and therefore necessarily included the ELA.

The Court finds these facts do not support a finding that MHC's purported delay should preclude a conclusion that irreparable harm exists. Any delay is not unexplained, and NE and SNH do not cite any evidence indicating that MHC improperly sat on its rights while attempting to resolve the litigation between the parties and allow them to go their separate ways. Moreover, as MHC notes, "'delay is only one among several factors to be considered; [the case law does] not support a general rule that irreparable injury cannot exist if the plaintiff delays in filing its motion for a preliminary injunction.'" *Chancey v. Ill. State Bd. of Elections*, 635 F. Supp. 3d 627, 643 (N.D. Ill. 2022) (citation omitted and alteration in *Chancey*].

Accordingly, the Court concludes that MHC will suffer irreparable harm and has no adequate remedy at law given NE and SNH's continued use if the MI-BOX mark and the potential harm the MI-BOX mark will suffer due to the following, as attested by Brian Born:

> One, the inconsistent and inaccurate proforma disclosures [made by Edward Smith] give MI-BOX a bad reputation, both among its subdealers and to other prospective business owners who might be interested in opening a MI-BOX dealership. Second, Smith has slandered MHC and the owners of MHC by telling other dealers that MHC does not run the business correctly, is understaffed and operates on a shoestring budget. Third, by brazenly violating the agreements with MHC, MI-BOX NE damages the MI-BOX name, reputation and trademark with the other MI-BOX dealers. Fourth, Smith has damaged MI-BOX's trademark by interfering with dealers' relationship with MHC by telling them not to use Fergie, the MI-BOX operating software, disparaging the software and actively promoting his competing software, Stella, to all other MI-BOX dealers. Fifth, Smith has threatened MI-BOX's suppliers demanding confidential information [,thus] hurting MI-BOX's trademark, tradename and reputation with its suppliers.

(Born Decl., Dkt. # 218-1, ¶ 85.)

### 3. Balance of Harms and the Public Interest

Regarding the balance of harms, this factor need not weigh as heavily in MHC's favor as the Court is persuaded that MHC will be successful in its Lanham Act claim. While the Court is aware that the imposition of an injunction may have negative effects on NE and SNH's business, NE and SNH have long been aware of the need to disengage themselves both from the MI-BOX mark and their associations with MHC. Indeed, as MHC points out, Edward Smith is in the process of establishing his own competitive presence in the mobile storage arena, including Smith's registration of an INBOX mark and Smith's formation of various INBOX portable storage entities. (Born Decl., Dkt. # 218-1, ¶¶ 81-84.) Without the injunction, NE and SNH could continue to use the MI-BOX mark without authorization. *Holbrook Mfg LLC v. Rhyno Mfg. Inc.*, 497 F. Supp. 3d 319, 335 (N.D. Ill. 2020) (in Lanham Act case, noting that "[w]ithout the injunction, Defendants

9

could continue to confuse consumers about their affiliation with Holbrook and the TORX® and TORX-PLUS® trademarked products, thereby acquiring goodwill that belongs to Plaintiffs.").

Consideration of the public interest includes considering any effects on non-parties. *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018). "Enforcement of trademark law serves the public interest by reducing consumer confusion," but "[o]n the other hand, 'trademark protection should not interfere with traditional policies of a competitive market.'" *Bump Health v. Miss to Mrs. Wedding Gifts d/b/a Bump to Mom*, No. 23 C 4101, 2023 WL 7220172, at *7 (N.D. Ill. Nov. 2, 2023) (citation omitted). While it is true that the abrupt stoppage of NE and SNH's ability to use the MI-BOX mark while transitioning to the INBOX business model may have some negative impact on the public's ability to access mobile storage in the affected areas, imposition of the injunction is simply accelerating by several months the inevitable end to the parties' business relationship. As MHC notes, the MDA does not contain a non-competition provision, so Smith may continue to operate and promote his INBOX services, just without using the MI-BOX mark. "The public interest would . . . be served because the injunction prevents consumer confusion in the marketplace." *Holbrook,* 497 F. Supp. 3d at 336.

Should the parties so request, the Court is open to discussing with them ways in which the provisions of the injunction can co-exist with the "de-coupling" of MHC from NE and SNH.

### III.     Conclusion

For the reasons stated above, the Court recommends to the district court that MHC's motion for preliminary injunction [218] be granted, and the following relief be granted to MHC:

> 1. NE and SNH are enjoined from using the name "MI-BOX" and confusingly similar variations thereof in connection with their businesses, including, by way of example and not limitation, in marketing in print or digitally, promoting, advertising, soliciting, selling, or offering for sale mobile storage and moving services and products facilitating the provision of such services including all boxes or mobile storage containers;
> 2. NE and SNH are enjoined from using the MI-BOX name or any similar variation thereof or the website domain, https://miboxne.com, or on social media accounts such as YouTube (including @mi-boxofgreaterbillericaan8369), Facebook, Instagram and Yelp;
> 3. NE and SNH are directed to remove any reference to MI-BOX New England, MI-BOX Southern New Hampshire, MI-BOX Greater Billerica and MI-BOX Northeast MA from Google Business Profile and delete all accounts on Google generally;
> 4. NE and SNH are enjoined from engaging in any conduct that tends falsely to represent that, or is likely to confuse, mislead, or deceive purchasers, potential purchasers, customers, and/or members of the public to believe that, the actions of NE and SNH the TRO Defendants, the services offered by NE and SNH TRO

10

Defendants, the products offered by NE and SNH RO Defendants, or NE and SNH TRO Defendants themselves are connected with MHC, are sponsored, approved, or licensed by MHC, or are some way affiliated with MHC or MI-BOX.

It is further recommended that the injunction terminate as of May 5, 2026, the expiration date of MI-BOX SNH's Equipment Purchase and License Agreement. MI-BOX NE's Master Dealer Agreement ("MDA") expired on June 1, 2022. (Born Decl., Dkt. # 268-1, ¶¶ 3-4.)

Under Federal Rule of Civil Procedure 65(c), "[t]he court may issue a preliminary injunction or a temporary restraining order *only if* the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." *BankDirect Capital Fin., LLC v. Capital Premium Fin., Inc.*, 912 F.3d 1054, 1057 (7th Cir. 2019) (emphasis in original). "Because the damages caused by an erroneous preliminary injunction cannot exceed the amount of the bond posted as security, and because an error in setting the bond too high is not serious, district courts should err on the high side when setting bond." *Manpower Inc. v. Mason*, 377 F. Supp. 2d 672, 681 (E.D. Wis. 2005). Nevertheless, "a district court cannot simply set the bond at whatever high number it thinks appropriate; instead, reasons must support the number chosen so that a reviewing court can determine whether such number 'was within the range of options from which one could expect a reasonable trial judge to select.'" *Id*. (citation omitted); s*ee also Monster Energy Co. v. Wensheng*, 136 F. Supp. 3d 897, 911 (N.D. Ill. 2015) (stating that "[t]he burden of establishing the bond amount rests with the party to be restrained, who is in the best position to determine the harm it will suffer from a wrongful restraint," and concluding "defendants should have provided affidavits or other evidence to establish the financial damage it would suffer from the injunction during the pendency of the case").

Both parties agree that NE and SNH will suffer losses upon entry of the injunction precluding it from using the MI-BOX name and mark. Indeed, NE and SNH's business has been built on the MI-BOX mark and its relationship with MHC since 2012; immediately cutting off NE and SNH from using the MI-BOX mark or offer services "connected" to MHC will undoubtedly be detrimental to NE and SNH. According to NE and SNH, "an injunction would disrupt existing customer relationships, impair goodwill developed over years of operation, and undermine confidence among customers, vendors, and employees," and that "[e]ven if operations could technically continue in some modified form, the business would be destabilized in ways that would predictably reduce revenue and market position." (*Id*. at ¶ 9.) NE and SNH seek a bond amount of $12,164,498.00, allocated as follows: Capital Investment $8,681,750.00; Goodwill $1,500,000.00; Revenue/Operations $1,712,748.00. MHC challenges these amounts.

NE and SNH's position that over $8.6 million in capital investment should be included in the bond amount is unsupported. Mr. Smith states that his entities "have invested substantial capital in the business, including expenditures for storage containers, delivery vehicles, lift systems, equipment, facilities, personnel, marketing, and operational infrastructure," and "reflects long-term, sunk capital deployed to serve customers in the region." (Smith Decl., Dkt. # 266-1, ¶ 4.) As Mr. Smith expressly states, this amount represents a long-term capital investment over the course of his companies' years-long relationship with MHC, yet he fails to explain how or

11

why NE and SNH would be entitled to recover all (or any portion of) these costs in the event the four-month long preliminary injunction is found to have been entered in error. Without more explanation, the amount of long-term capital investment is not particularly informative as to the possible damages caused by an erroneous injunction, particularly in this situation where the parties' business relationship will end soon (and therefore NE and SNH's historical capital expenditures will be at risk in any event).

Similarly, Mr. Smith attests that NE and SNH will suffer damages for lost goodwill and their customer relationships and operations would be adversely affected in the amounts of $1,500,00.00 and $1,712,748.00, respectively. According to Mr. Smith, these "would accrue throughout the pendency of the injunction." (*Id.* ¶ 10.) The Court finds the claimed amount for goodwill is not properly supported and, in any event, is duplicative of the amount listed for lost revenue and disrupted operations. If customers or potential customers either stop or forego doing business with NE and SNH because of the injunction, those losses would be reflected in the disruption to customer relationships/revenue and operations. Further, as goodwill is an accounting measure to quantify a company's value as a *going concern* beyond its tangible assets, any measure of goodwill in this context would be particularly speculative given the pending termination of the parties' business relationship. *See U.S. v. Winstar*, 518 U.S. 839, 849 (1996) ("the recognition of goodwill as an asset makes sense: a rational purchaser in a free market, after all, would not pay a price for a business in excess of the value of that business's assets unless there actually were some intangible 'going concern' value that made up the difference"). So, the amount NE and SNH propose for goodwill is disallowed.

Finally, as MHC notes, the $1.7 million NE and SNH lists for revenue and operations disruptions resulting from an improperly imposed injunction is also unsupported. Mr. Smith sets forth a total number with no indication of how that amount was calculated; the Court has no basis on which to conclude that the amount is appropriate.

In its discretion, and considering the discrete period at issue, the Court recommends a bond amount of $250,000.00 to cover any damages NE and SNH may suffer due to a wrongly imposed injunction. MHC's request for a nominal bond amount because its coffers have been depleted by this and related litigation with NE and SNH is unavailing. MHC has participated in all the legal proceedings of its own accord.

**Date**: January 22, 2026

*M. David Weisman*
_____
**M. David Weisman**
**United States Magistrate Judge**

12